May it please the Court, my name is David Cooper. I am here representing the appellant Citri-Lite. I'd like to reserve about three minutes, if I could, of my time. I'll watch the time myself as best I can. We're here following a court trial and judgment in the Eastern District in which the court rejected Citri-Lite's contention that Cott had breached an exclusive license agreement, specifically a provision in the license agreement that required Cott, among other things, to otherwise use commercially reasonable efforts to promote and sell the product, in this case a beverage that had been developed by Citri-Lite, so as to maintain and enhance the value of the product's goodwill and also maximize, maximize royalties under the term of the agreement. In rejecting Citri-Lite's position, the trial court made a series of, reached a series of legal conclusions that are seriously flawed. Can I stop you there? Yes. Because I'm already having a hard time accepting that notion. So let me tell you what my basic problem with your case is. I don't see any legal errors here. I see the judge as having conducted a pretty lengthy trial and made very lengthy factual findings as to whether the defendant, in fact, made commercially reasonable efforts, and that there's just, we're going to review that for clear error. And, you know, I, to me, that just seems where you get stuck, is that we're just, we're dealing with factual findings that the judge made adverse to your client. And so give me the sense of where the legal problems are. A fundamental legal problem, dead wrong, is the notion that the termination provision in this contract is reciprocal, that there's an easy out for both the licensor and the licensee. And it's, and it's, so what, the imbalance between the positions is at the heart of the business. But you still have to show that the efforts they undertook were not commercially reasonable, right? Given the totality of the business relationship, and the basic fundamental position of Citrolite is this, that where a licensee in an exclusive license has bargained for an easy out, for the right to get out any time they want with 60 days' notice, their fundamental obligation is for the entirety, so long as that contract is in effect, up to the day that it ends, that it ends, their efforts have got to be reasonably calculated to achieve the bargain for objectives of the licensor. In this case, it's not a covenant of good faith and fair dealing. They've said what they are, to maintain and enhance the value of the brand, and to maximize royalties. We know, we know, there's no dispute that was not caught subjective as of May and June 2005. We know that its objective was not to maximize royalties, but to reduce ROAS, to get rid of product in connection with an exit. We know, both from the Gormley e-mail, from Nichols' testimony, the guy who was ahead of the Bentonville operation, that the entire effort was to get rid of ROAS and establish minimum royalties, the royalty provisions of 3.2. That's not the contract. Once they had every right to change their objective any time they wanted, once they did, they had an obligation to either proceed to enhance the value, to maximize royalties, or bail. They didn't. Roberts. Let me just stop you there. Yes. Because, again, all I'm hearing from you is that you're saying from that period May forward, the efforts they undertook were not commercially reasonable, and you want us to reverse the district court's adverse judgment? No question about it. And at that point, let's look at what efforts there were at the main venue where this product is sold, Sam's Club. Let's count them, okay? Do they make a packaging change, a packaging change that Cott, not Citrolite, that Cott claimed was critical for the survival of the product? But the judge made findings of fact about that, that there was an effort to get that approved by Sam's. It took a substantial period of time. It didn't get approved until after notice of termination. In effect, you're asking that we hold as a matter of law that the facts cut in your favor, that if you had moved for summary judgment on the facts as they developed, you would win. Is that your position? I do. I actually do think that that's correct. I do think that when you have a venue like Sam's Club where the only promotional activity that's identified in the record are sampling or demos, where you have a company that says its main spokesman, the person at Dentonville, says products on life support unless we make a packaging change, that it's a billion-dollar company. We're not talking about a company that's got 50 cents in the bank. It's a billion-dollar company. It doesn't sample once for the next eight months. It doesn't make a packaging change. It doesn't do any of that. And then basically to suggest that those efforts are reasonably calculated to enhance the value or even to help the product survive, there is no testimony in the record that suggests that. All the testimony is that within the beverage industry, and I'm not talking about Citrolite, I'm talking about the president of Cott, who negotiated this agreement for the president. Rare that you have that. He says demos, okay, we know we have to keep promoting. We understand that. We know that the term maintain and enhance has a meaning in the beverage industry. It means we're going to build the brand and for this, for our purposes here today, not harm the brand. And so your main complaint is, if I'm right, is that they just stopped doing the demos? Stopped doing the demos completely as of they notified in March, stopped in April. Right. Number one. Well, okay, but is, okay. That is the primary. And that was the subject of conflicting expert testimony, right? I'm sorry, I didn't hear that. That was the issue was the subject of conflicting expert testimony at trial, and the judge found their expert more credible than yours. Well, not conflicting. I beg to differ on that, that there's certainly no conflict that there wasn't any demos. But as to whether the decision to stop them was or was not commercially reasonable. Right. But now, well, now you have Mr. or Dr. Buckland. Who acknowledges no expertise in the beverage industry, number one. Who uses a definition of commercial reasonableness, which is profit uber alice in the Bloom language, which is kind of cost benefit from Cots perspective. Okay, not in terms of the customs and practices known in the specific industry. That's the critical thing you bargain for in a commercially reasonable, when you have that language in a contract. You are bargaining that the, in this case, the licensee will use efforts that within the beverage industry are deemed diligent, even just diligent. Doing no promotion, there's no dispute. But at a certain point, they determined that this was not helping sales. Doing the demos was not having any kind of long-term impact on sales. On increasing sales, on increasing. Dr. Buckland testified he did not look at, could not statistically in his view, but did not look at the period from April 2005 to December. He looked only at a period when demos were being conducted, two times a month for two-thirds of the period, a little over one a month. No question about it, his testimony would support a finding by the judge that they were ineffective in increasing sales or that they were incrementally costly, that they cost more bang for the buck. Fair enough, but that's not the position we're talking. But why would it be commercially reasonable to spend money on some promotional activity that actually is a net loser to you in terms of generating profit? Because your start, well, the, from Citrolite's perspective, it turned over a product that was selling 700,000 cases a year, $4.5 million worth. Basically, the notion that if you cease promotion altogether, and you are going to somehow maintain that sales level, flies in the face of common sense, much less any of the testimony that was given in the trial. So our beef is that if Citrolite, if Cotts said, as you just indicated, it makes no sense, we're getting no incremental bang for the buck here. Their solution, and the only solution they bargained for under the contract, at that time, their solution is to say, we're out of this, you take it over yourself. And they bargained for it. That's the way they protect their economic position. But you have to let it sit. But your client was protected by the guaranteed minimum royalty. That, to me, is the, I mean, you pointed out the district court's error on the termination provision, but I think the Court was absolutely right to say that, you know what, in terms of the balance of power here, your client actually negotiated for a pretty significant protection. I would submit that's dead wrong. It's dead wrong under the law of California. Okay.  Alitoso, let me ask this as a factual matter. Is the guaranteed minimum royalty that your client secured under this contract, is it more than the maximum profit the company had made? Yes. Yes, it is. Because why? Let me go back to the wording of the actual contract these guys negotiated. Maintain and enhance the value of the goodwill, the value of the brand. And Paul Richardson testified that's different than an income stream. This guy, these guys bargained for a lot more than $350,000 a year. They bargained to have a brand intact when this thing was over with, whether that was two months or after 60 days. The fact that you've got an income stream doesn't protect you at all. That's why the language was in there. Undisputed, that's how the language is understood in the beverage industry. And so our basic beef, our contention, even if these guys paid us out for two years, we had a product that had value. At the end of this, it had no value. That's what we had bargained for to maintain it. Also maximize royalties. Okay. Not minimum royalties. That's Marsau. That's this Court. Okay. Minimum royalty provision does not meet the contractual obligation, even if we're talking about the covenant of good faith and fair dealing. These guys actually wrote it in to the thing. So I would submit, Your Honor, that the Court was dead wrong on that. It was dead wrong in how it conflated marketing and promotion. The word promotion is used in the presentation. Let me end your last three minutes. Yes, I'm sorry, Your Honor. I'll reserve. Go give me your phone for a minute. Thank you. Good morning, Your Honors. May it please the Court. Gregory Ellis on behalf of Cott Beverages, Incorporated. Also in court with me is Marnie Poe, Cott's general counsel. Counsel, why don't you just just jump right to the most, your soft spot. Okay. There is a period after which you have some bad e-mails, some bad documents that suggest Cott had just given up on the product and just wanted to cut its losses. So maybe just zero in on that and explain why the Court wasn't clearly erroneous in finding that you were still maintaining commercially reasonable efforts at that point. Thank you, Your Honor. I'll cut to the chase and talk about that last portion of the contract period, which the Court does address in its factual findings. There are some bad e-mails that talk about a strategy, a proposed plan to cut raw materials. An exit strategy. An exit strategy was the word that was used in one of the e-mails. But as the Court noted, Cott, despite this exit strategy that was being discussed back in Tampa, which is Cott's headquarters, the folks in Bentonville, Arkansas, who were on the ground working with the product, working directly with Sam's Club, were at the same time and continuing over the course of the agreement, working with the new Sam's Club buyer. They knew that they had to get the buyer's approval for a packaging change. And a packaging change, as there was plenty of testimony at trial, would require not merely a depletion of raws, but a completely new set of incoming raw materials, a new packaging configuration. In other words, at the same time that the folks in Tampa are talking about possibly pursuing an exit strategy in depleting raws, the actual work being done, as the district court found, was completely at odds with the strategy to simply deplete the raws and get out of the product. Cott was still working all the way through November, even after it gave notice of termination, to move on to a new package, something completely different from raw materials. In addition to that, something that didn't come up in the first part of the argument is that during the entire course of that 2005 period, there was another promotional effort going on at Sam's Club, and that's the price reduction. Cott had agreed to a price reduction at Sam's Club as an effort to try and increase sales, increase distribution. That remained in place throughout all of 2005. And Mr. Horrigan, Citralight's principal, knew full well that that price reduction was being used as part of the promotional efforts. There are e-mails in the record. It's at ER801C. There's an e-mail from Cott to Mr. Horrigan specifically asking to reduce the cost as part of the 80-cent promotional effort. Mr. Horrigan responded quite simply, go ahead. Elsewhere in the record, there was a similar e-mail exchange between Citralight, Mr. Horrigan, and Cott about a price reduction to try and get into Wal-Mart. Again, this was another effort that took place, biggest retailer in the world. Cott got the product in there and it failed. Is that post-May of 2005? That's pre-May of 2005. By May of 2005, the effort had been made at Wal-Mart. Okay. Every store, the product just didn't work. Yeah, I remember that. So what did you do post-2005, May? Okay. In addition to post-2005 May at Sam's Club, which we talked about, working with the buyer, continuing to work with the packaging change, Cott made additional efforts to try and get back into Wal-Mart. There were several discussions between the Cott representative who was in charge of the Wal-Mart account and different buyers at Wal-Mart to try and get that product back in. And the buyer eventually said no. But again, these are contacts taking place after May 2005, after this proposed exit strategy is being discussed. So we have efforts to get back into Wal-Mart. We have working with the new Sam's Club buyer to approve a packaging change. Proposals to move forward with a packaging change, which, as the district court found, would be completely at odds with the strategy to reduce raw materials. And then, even after the contract ended, Cott continued to work with Citrolite while it tried to find a new buyer. These are all, obviously, efforts to try and maintain the brand, try not to harm the brand, try to keep going and not simply exit the brand and leave Citrolite with nothing. And in the discussion of what commercially reasonable efforts called for, Mr. Cooper focused on the language that was bargained for as part of the contract, to promote and sell the product so as to maintain and enhance the value of the goodwill. What Mr. Cooper leaves out, what Citrolite has tried to ignore is the word that comes right before that phrase, efforts. The parties did bargain to try and increase the brand, to try and maintain it. But this wasn't a guaranteed contract. This was a contract in which Cott agreed to make commercially reasonable efforts. And that's the part that gets left out in the analysis. And I've just gone over the efforts that continue to be made after May of 2005. So I think that does dispose of this soft spot that we talked about, this, these bad looking e-mails from Tampa. In addition to that, though, the Court did point out that even Mr. Horgan acknowledged that there might have been a right-hand, left-hand situation where Tampa was talking about one thing, and Team Bentonville, which was on the ground working with Sam's, was doing something very different. And the Court found something that was intended to help maintain the brand at Sam's Club. Let me ask you about a different topic then. You know, I think the plaintiff has a legitimate beef, potentially, that if you were going to just stop doing the demos altogether, you should have told them at an earlier point in time, and that there was maybe some, I don't know if you call it deception, but there certainly wasn't the candidness that they, you know, expected from their business partner here. Maybe you can address that issue. Sure. I think there's a couple of responses to that, both grounded in the findings of the district court after trial. First of all, the district court pointed out that Mr. Horgan, who was very sophisticated in this industry, and particularly with this licensing type of agreement, he knew how to write a licensing agreement, he'd done it for decades, but he didn't think it was important to draft in any particular provisions regarding communications. He knew how to draft those provisions. He didn't put them in the contract. Specific levels or quality of communication is simply not something that was expressly bargained for, which moves us on to a potential good-faith issue. And the district court addressed that as well. The district court concluded from Mr. Horgan's own testimony that the COT representatives he was dealing with were honorable people. I believe that's the exact language that was used. I'm pretty sure the finding was that Mr. Horgan called them honorable. But from looking at, from listening to Mr. Horgan, from reviewing all the e-mails and communications between COT and Citralite, the district court concluded, and this is a finding of fact subject to clear error review, that there wasn't any deception. At one point, the district court pointed out, correctly based on what was presented at trial, that COT was in the dark itself as to what was going on at Sam's Club. There was a buyer transition which took several months longer than it needed to, than it was expected to take. And that was a critical point because, as everyone agreed at trial, the Sam's Club buyers are the gatekeeper to Sam's. They set the retail price. They need to approve the packaging change. They make the ultimate distribution decisions. But COT couldn't have been in the dark as to whether it was continuing to do demos or not. That part wasn't necessarily in the dark. That was COT's decision. But the decision. But that's what they're complaining about. They're saying, look, at that point in time, when you stopped doing the demos, the game was basically over, given the history of the brand and how sales had been generated, and yet you, for, you know, a period of several months, they were in the dark, that this decision had been made. Well, they were aware that, for the time being, which eventually turned out to be the case, that demos stopped. But again, as the court pointed out in its findings, COT didn't completely shut the door on demo spending at Sam's. It determined that if it needed to run additional demos to meet the 80-cent provision, notwithstanding the fact that this was just buying volume and not having any effect, they would do so. So the door wasn't completely shut on this concept of demos at Sam's. So between the combination of the finding that COT acted honorably, the finding that COT remained open to running demos as necessary to satisfy the contract, the ultimate conclusion to be drawn with that was that there wasn't any deception. There wasn't any attempt to keep Citralight in the dark, because, frankly, COT was still reassessing what was going on at Sam's Club and what it would have to do going down the line into the future. So with those points, I just want to address a couple of points very briefly. There's a very heavy focus in the briefing that commercially reasonable efforts required these demos at Sam's Club to continue. And that's, again, done with a very heavy focus on what the industry standards were. Now, the case law is pretty clear, both inside and outside of California, that commercially reasonable efforts are not judged solely with reference to industry standards. It's certainly a relevant factor. It's not the only factor. And the district court took into account all the relevant factors. But there's one other point in the factual record. Roberts. Can I ask this just historically, though? Let's focus on that 80 cent. Is that 80 cents per case? Yes, the 80 cent per case provision. Okay. Is it true that basically all of that money, all of that 80 cents consisted of doing the demos? All that caught was able to satisfy the 80 cents by running demos at Sam's Club and at Walmart. The 80 cents, that quantified amount didn't take into account the price cut. Okay. But if I remember from the record that when they were negotiating this, that particular provision of the contract, they came up with 80 cents because that represented the historical expenditures that Citrilite had been making to do the demos. That's right. And that's what the court found. Why? I mean, that does seem to suggest that there was this contemplation of the parties that since we pegged the figure at exactly these kinds of promotional efforts, that's what we're bargaining for going forward, right? I think that's right. And with that pegging of the demos to the 80 cents, by satisfying the 80 cent provision over the course of the contract by running demos, caught, satisfied the 80 cents, and satisfied what was contemplated at the time regarding demos. And I think that's also supported by Mr. Richardson's testimony. He testified that the subject of demos was brought up in the context of this 80 cents, but beyond that, he didn't remember any specifics of a demo program. He certainly didn't agree that a particular demo program would remain in place.  Mr. Dragovich, who talked about what the standard and practice was with respect to demos at Sam's Club. Both of the Sam's Club buyers, Ms. Fields, Mr. Dragovich, were asked about the importance, the practice regarding demos. Both of them testified that demos weren't required at Sam's Club. So even this focus on industry standards, on the idea that demos somehow are dictated by industry standards, is at odds with the very people who helped define what those standards were, the Sam's Club buyers. Finally, this argument that comes up in the reply brief came up briefly today, that the licensing, when there's an exclusive licensing agreement, the licensee has to act and make its decisions with an eye toward what the licensor's opinion is that is detrimental to the licensee. That's just unconnected to any of the facts or the law here. First on the law, none of plaintiff's cases, not Marsu, not Bluer, not United Roasters, actually stand for that proposition. The cases that define commercially reasonable efforts define it as conduct that gives both sides fair treatment, not conduct that gives one side preference over the other. Likewise, the language of the contract itself, this is Section 10.3, states that this agreement did not create any type of agency relationship. It didn't create a joint venture relationship. It didn't create a partnership relationship. It essentially disclaimed the type of fiduciary duty that citrullites are arguing for in the context of an exclusive licensing arrangement. Likewise, the recent Pedotti case out of California addresses the same argument in the context of a best efforts provision, which is, according to a citrullites expert, a higher standard in the beverage industry than commercially reasonable. And there, the Court held that even in a best efforts world, a fiduciary duty or a fiduciary level of obligation is not imposed upon the performing party. So I think that disposes of that argument as well. So unless there are any other questions, I ask that this Court affirm the judgment of the district court. Scalia. Thank you, counsel. Thank you very quickly. Moving last point first, the Pedotti case actually was a case that was submitted after the briefing by the, by COT, by the respondent. And certainly we do not contend, have never contended that the fiduciary duty is a standard. None of the cases we've relied on say that. But it's got the language in it which I think defines the standard. And it says, not a fiduciary, rather it requires a party to make such efforts as are reasonable in light of that party's ability and the means at its disposal and the other party's justifiable expectations. That's the language. There's nothing remarkable about that language. I think that's what's required. And it's our position, not that they, not that COT has to exclusively think of ours, but when you have a billion-dollar company that is not claiming, as in Bloom, in Bloor, I'm sorry, in front of the Second Circuit, I guess, where bankruptcy is at issue, the Ballantyne, the Falstaff case, where you've got an issue that you're not making the profits that you want, but you've got an ability to bail out on 60 days, not even pay illiquidated damages, as you will in Bloor, that affects the calculation, the calculus when you look at the totality of the business relationship. To suggest that the 80 cents satisfies the promotional obligation given the expectations of the parties, to me, is perverse. And it's perverse because you have a quantifiable, a quantification which depends on cases sold, and so that when you stop promoting and sell no cases or sell fewer and fewer cases, that's how you meet your 80 cents obligation. That's how it was met in this case. The reason it was met is sales went down so much in 2005 compared to 2004 when sales went down from 41 truckloads to five in just two years. Going to the communication issue very quickly, it is not our contention that there is an evil person at caught behind this. There may have been a left-hand, right-hand problem. Charles Collese, who was the person actually in charge of brands like this, testified, he thought demos were going on throughout, okay? So he certainly didn't lie to Mr. Horrigan. We're suing caught. Citralite has a right to rely on caught as an institution for correct information. They knew first of the year that they were planning to discontinue demos. They announced it in March, and we have Mr. Horrigan in September sending an e-mail to them asking how many demos were done this month. I can't understand why it's so low. No question a disconnect at caught's feet. And basically, given the history of these parties, it is reasonable for them to have expected some notice on that. And with that, I'll submit Your Honor. Thank you very much. Thank you, counsel. The case is argued. We'll please submit it.
judges: Lynn, Reinhardt, Watford